**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| DIRECT AUTOMOTIVE<br>MANAGEMENT, INC.,<br><br>       Plaintiff,<br><br>  v.<br><br>VOLKSWAGEN GROUP<br>OF AMERICA, INC., a<br>New Jersey Corporation,<br>VOLKSWAGEN AG, a<br>German corporation,<br>ROBERT BOSCH, LLC, a<br>Michigan limited liability<br>company, and ROBERT<br>BOSCH GmbH, a German<br>corporation.<br><br>       Defendants.        | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Case No.** <u> 1:17cv1461  (LO/MSN) </u> |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

      Plaintiff, DIRECT AUTOMOTIVE MANAGEMENT, INC. (hereinafter "DAM"), hereby files this Complaint and Demand for Jury Trial against Defendants, VOLKSWAGEN GROUP OF AMERICA, INC. (hereinafter "VW Group"), VOLKSWAGEN AG (hereinafter "VWAG"), ROBERT BOSCH, LLC (hereinafter "Bosch LLC"), and ROBERT BOSCH GmbH (hereinafter "Bosch GmbH"). DAM seeks to recover damages it suffered from a proposed new dealership which it was awarded prior to the revelations of fraud and other malfeasance surrounding the emissions of Volkswagen's TDI automobiles. In support thereof, DAM asserts as follows:

## INTRODUCTION

On September 18, 2015, the most significant fraudulent event in the automotive industry in decades was revealed.  The United States Environmental Protection Agency ("EPA") charged that Defendants had collectively engineered a massive scheme to fraudulently obtain environmental certifications for over half a million automobiles.  Defendants working collaboratively installed and programmed "defeat devices" in "Clean" diesel automobiles marketed and distributed by VW Group to VW franchise motor vehicle dealers.  The "defeat devices" enabled each vehicle to recognize when it was undergoing emissions testing versus operating under normal driving conditions.  If the vehicle was undergoing emissions testing, the defeat device would curtail engine performance to reduce emissions, ensuring its compliance with both the EPA and the California Air Resources Board ("CARB") regulations regarding oxides of nitrogen ("$NO_X$") emissions.  However, when the vehicle was in normal operation, it emitted up to forty (40) times the $NO_X$ standard allowed under federal and state laws and regulations, including the Clean Air Act ("CAA").

As a result, over half a million vehicles sold by VW dealers are non-compliant with US environmental regulations and will either be bought back and removed from operation or require costly, performance-degrading fixes.  Either way, the emissions scandal has degraded the public's trust and opinion of the Volkswagen brand, and by extension, its franchise dealers.  This sentiment has greatly diminished the current and expected revenue for both prospective and existing franchise dealers.  Those vehicles implicated are the following: 1) VW Jetta 2.0 Liter Diesel Models from 2009-2015; 2) Volkswagen Jetta SportWagen 2.0 Liter Diesel Models from 2009-2014; 2) Volkswagen Beetle 2.0 Liter Diesel Models from 2012-2015; 3) Volkswagen Beetle Convertible 2.0 Liter Diesel Models from 2012-2015; 4) Volkswagen Golf 2.0 Liter Diesel Models

from 2010-2015; 5) Volkswagen Golf SportWagen 2.0 Liter Diesel Models in 2015; 6) Volkswagen Passat 2.0 Liter Diesel Models from 2012-2015; and 7) Volkswagen Touareg 3.0 Liter Diesel Models from 2009-2016 (collectively the "Affected Vehicles").

When the massive fraud became public, DAM was two years into an ambitious project to open a new VW-brand dealership in Westerville, Ohio. DAM continued to expend time, energy and money towards this goal. However, with the buyback of many of the Affected Vehicles, the earnings outlook for the new VW dealership has dimmed significantly. And, while VW Group and VWAG have settled with existing VW franchise dealers, those dealers in the process of opening new dealerships have been excluded. Therefore, DAM is instituting this action to seek compensation for its losses relating to the emissions scandal and fraud, which has become known as "Dieselgate."

## PARTIES

1.   Plaintiff, DAM, is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 3900 W. Kennedy Blvd., Tampa, Florida 33609.

2.   DAM's principal, Jason Kuhn, is the owner-operator of multiple, new automobile dealerships in and around the greater Tampa-area. DAM, a separate entity established by Mr. Kuhn, was awarded a contract to open a new VW-branded dealership by VW Group in a defined area generally known as Northeast Columbus, Ohio.

3.   Defendant, VW Group, is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.

4.   VW Group is engaged in the business of distributing new motor vehicles and related parts and accessories in all 50 states, and is the sole authorized distributor in the United States of VW-branded automobiles to a nationwide network of VW franchise dealers.

5.   VW Group is a wholly-owned subsidiary of VWAG.

6.   VWAG is a German corporation with its principal place of business in Wolfsburg, Germany.

7.   VWAG is in the business of designing, developing, manufacturing, and selling automobiles.  It is the parent corporation of VW Group as well as Audi AG and Porsche AG.

8.   VWAG, with the assistance of Bosch GmbH, engineered, designed, developed, manufactured and installed the defeat device software on the Affected Vehicles and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States at VW-branded franchise dealers.  VWAG also developed, reviewed and approved the marketing and advertising campaigns designed to drive sales of the Affected Vehicles.

9.   VW Group and VWAG were and are at all times relevant to the allegations in this Complaint working in concert under the common objective to engage in the emissions fraud scheme described herein.  Each of VW Group and VWAG were and are the agents of each other and have acted and act for their common goals and profit.  Therefore, all acts and knowledge ascribed to one of VW Group or VWAG are properly imputed to the other.  VW Group and VWAG are referred to collectively herein as Volkswagen or "VW."

10. At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased and warranted the Affected Vehicles under the Volkswagen, Audi and Porsche brand names throughout the United States.  Volkswagen and/or its parents, affiliates and agents designed, manufactured, and installed the Clean Diesel engine systems in the Affected Vehicles, which

included the "defeat device" manufactured by Bosch GmbH and programmed by Bosch GmbH and Volkswagen.   Volkswagen and/or its parents, affiliates, and agents developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

11. From at least 2005 to 2015, Bosch GmbH, Bosch LLC and CEO Volkmar Denner (together, "Bosch") were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices specifically designed to evade U.S. emissions requirements in vehicles sold solely in the United States.   Bosch GmbH participated in the development of the defeat device, and Bosch GmbH and Bosch LLC participated in the scheme to prevent U.S. regulators from uncovering the device's true functionality.   Moreover, Bosch's participation was not limited to Bosch GmbH's primary role in engineering the defeat device (in a collaboration with VW described as unusually close).   Bosch LLC marketed "Clean Diesel" and lobbied U.S. regulators to approve the Affected Vehicles.   These lobbying efforts, taken together with evidence of Bosch LLC's and Bosch GmbH's actual knowledge that "akustikfunktion" operated as a defeat device, and participation in concealing the true functionality of the device from U.S. regulators, can be interpreted only one way under U.S. law: Bosch LLC and Bosch GmbH were both knowing and active participants in a massive, decade-long conspiracy with VW to defraud U.S. consumers, regulators and existing and prospective franchise dealers.

12. Robert Bosch GmbH ("Bosch GmbH") is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.   Bosch GmbH is the parent company of Robert Bosch LLC.   Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to Volkswagen for use in the Affected Vehicles.   Bosch GmbH is subject to personal

jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Bosch LLC, and over the design, development, manufacture, distribution, testing, and sale of hundreds of thousands of the defeat devices installed in the Affected Vehicles sold or leased in the U.S.

13. Robert Bosch LLC ("Bosch LLC") is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331. Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH. Bosch LLC directly and/or in conjunction with its parent Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat devices to Volkswagen for use in the Affected Vehicles.

14. Both Bosch GmbH and Bosch LLC (together with Volkmar Denner, "Bosch") operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector, which supplies parts to the automotive industry, and its Diesel Systems division, which develops, manufactures, and applies diesel systems, are particularly at issue here and include the relevant individuals at both Bosch GmbH and Bosch LLC. Bosch's sectors and divisions are not grouped by location, but by subject matter. Mobility Solutions includes the individuals involved in the RICO enterprise and conspiracy at both Bosch GmbH and Bosch LLC. Some individuals worked at both Bosch GmbH and Bosch LLC during the course of the RICO conspiracy. The acts of the individuals described in this Complaint have been associated with Bosch GmbH and Bosch LLC whenever possible. Regardless of whether an individual works for Bosch LLC in the U.S. or Bosch GmbH in Germany, the individuals hold themselves out as working for "Bosch." Bosch documents and press releases often refer to the author as "Bosch"

without identifying any particular Bosch entity.  Thus, the role of each Bosch defendant herein can only be more accurately ascertained once discovery commences.

15. From at least 2005 to 2015, Bosch GmbH, Bosch LLC, and currently unnamed Bosch employees were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices specifically designed to evade U.S. emissions requirements in vehicles sold solely in the United States.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because DAM's claims arise under the RICO Act, 18 U.S.C. § 1962.  There is also diversity jurisdiction because DAM and Defendants reside in different states and damages incurred by Plaintiff are in excess of $75,000.  The Court has supplemental jurisdiction over DAM's state law claims under 28 U.S.C. § 1367.

17.  This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. §§ 1965(b) and (d).  This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States, this judicial District and the State of Virginia, and intentionally availed themselves of the laws of the United States and this State by conducting a substantial amount of business throughout the State, including the design, manufacture, distribution, testing, sale, lease and/or warranty of Volkswagen vehicles in this State and District.  Further, VW Group has its principal office in this State and District.  At least in part because of Defendants' misconduct as alleged herein, the Affected Vehicles ended up on this State's roads.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or many of the acts and transactions giving

rise to this action occurred in this District, including, *inter alia*, Volkswagen's business operations were headquartered in this District and Defendants' promoted, marketed, distributed and sold the Affected Vehicles to consumers in this District.  Defendants sell a substantial number of automobiles in this District, have dealerships located throughout this District, and their misconduct occurred in part in this District.  Venue is also proper under 18 U.S.C. § 1965(a), because Defendants are subject to personal jurisdiction in this District, as alleged in the preceding paragraph, VW Group resides in this District, and all Defendants have transacted affairs in this District.

## FACTUAL ALLEGATIONS

19. Jason Kuhn has operated new automobile dealerships in Florida for the last twenty (20) years, including two Volkswagen-branded dealerships in the greater Tampa, Florida area.

20. A few years ago, in the midst of the financial crisis, another VW dealership in New Port Richey, Florida, ran out of money and began defaulting on its mortgage.  Mr. Kuhn had loaned the owner-operator of the store the money needed to construct the building and sold it back to him a year later.  This transaction was financed by VW Credit, Inc. and it had required that Mr. Kuhn be a guarantor.

21. Fearing that the default on the mortgage by the owner-operator could implicate him as guarantor, Mr. Kuhn discussed purchasing the store outright with Volkswagen.  Volkswagen did not want Mr. Kuhn to own three (3) stores in the greater-Tampa area, but also did not want to close the New Port Richey store either.  No other potential buyers materialized.

22. Therefore, Mr. Kuhn and Volkswagen struck an agreement wherein he would purchase the New Port Richey store, run it until the economy improved, and then divest himself of it so as to

not maintain an outsized market share.  In return, Volkswagen, specifically Don Hughes, promised to find an opportunity for Mr. Kuhn to own another Volkswagen "point" or dealership location.

23. That agreement ultimately resulted in Mr. Kuhn receiving the Letter of Intent at the heart of the instant matter.

24. On August 30, 2013, VW Group issued a Letter of Intent to DAM, awarding it the ability to open a new VW-branded automobile dealership in Westerville, OH (hereinafter the "Westerville LOI").  **(Exhibit A - Westerville LOI).**

25. A Letter of Intent is a contract that requires the prospective automotive dealer to meet certain milestones related to opening the dealership (e.g., meeting financial capitalization requirements, obtaining suitable real property for the dealership site, completing construction by strict deadlines, etc.) in return for VW Group agreeing to execute a contract with the prospective dealer enabling it to market, sell and service VW-branded automobiles.  Such a contract for the sale of new automobiles is oftentimes referred to in statutes as a "Franchise Agreement."

26. A Letter of Intent is analogous in form to an option contract on a stock purchase.  Upon meeting certain milestones, the Letter of Intent gives the holder the right to enter into a Franchise Agreement.  Similar to an option contract, the value of the Letter of Intent is derivative of the value of the underlying asset, in this case, a VW-brand, new motor vehicle dealership.  Therefore, if the value of the underlying asset depreciates, the option or Letter of Intent similarly declines in value.

27. Notably, the Westerville LOI is severely slanted in favor of VW Group.  **(Ex. A).**  For example, DAM is required to indemnify, defend and hold harmless VW Group, but the duty does not also flow from VW Group to DAM.  *Id.* at ¶ 17.  Further, VW Group, in its sole discretion, can terminate the Westerville LOI, but there is no corresponding ability for DAM to terminate, no matter the situation.  *Id.* at ¶ 16.

28. Furthermore, the Westerville LOI was presented to DAM in a "take it or leave it" fashion. DAM had no power to request modification of the terms or most of the substantive requirements of the Westerville LOI.

29. There is a great disparity in bargaining power between Volkswagen and DAM. Volkswagen holds all of the power in the franchisor/franchisee relationship and exerts similar power in negotiations with prospective dealers. This disparity in bargaining power has been recognized by legislatures nationwide and as a result they have enacted remedial legislation in an attempt to prevent abuses of power by manufacturers over their franchise dealers. *See, e.g.*, §§ 320.60-320.70, Fla. Stat. (2017).

30. Upon receipt of the Westerville LOI in August 2013, DAM set out to accomplish the milestones and in doing so expended substantial funds, both in seeking the initial award of the Westerville LOI as well as in working to fulfill its terms.

31. The Westerville LOI called for the VW-brand dealership to be located in a defined area generally-known as Northeast Columbus, Ohio. DAM presented VW Group with multiple potential dealership locations in this defined area and it was agreed that a parcel in Westerville, Ohio was the most appropriate choice. However, it was later learned that the Westerville city government is particularly hostile to car dealerships. In fact, it is has only allowed one dealership that was grand-fathered in following the formation of the municipality. Westerville had never had a new dealership constructed within its city limits. This presented significant obstacles to the accomplishment of the milestones required in the Westerville LOI. So much so, that VW agreed to extend the Westerville LOI multiple times.

32. On June 6, 2014, VW Group issued an amendment to the original Westerville LOI extending the deadlines for DAM to complete construction and other construction-related

objectives (hereinafter the "First Amended LOI").  Other than changes to these dates, the First Amended LOI was substantially similar to the original Westerville LOI.

33. Similarly, on January 15, 2015, VW Group again issued an amended Westerville LOI extending the construction completion date and other construction-related deadlines (hereinafter the "Second Amended LOI").  Again, other than changes to the deadline dates, the Second Amended LOI was substantially similar to the original Westerville LOI.

34. On July 22, 2015, after much back and forth and expense, DAM secured approval from the City of Westerville for the Final Development Plan for the proposed dealership.

35. This approval was secured at great expense to DAM.  It expended substantial funds on, among other things, the option to purchase real property, design and architectural services for the proposed dealership, and securing permits and approvals from local governmental entities for the site of the proposed new automobile dealership.

36. Unfortunately, all of DAM's hard work and funds expended in reliance upon the Westerville LOI would lose much of its value in a matter of moments.

37.  On September 18, 2015, the United States Environmental Protection Agency ("EPA") issued a Notice of Violation ("NOV") detailing the deliberate fraud by VW Group.  **(Exhibit B - September 18, 2015 NOV from EPA).**

38. On November 2, 2015, the EPA issued a second Notice of Violation of the CAA (the "Second NOV") to VWAG and VW Group for similar, but not identical fraud as alleged in the First NOV.  **(Exhibit C - November 2, 2015 NOV from EPA).**

39. The NOV laid bare a surreptitious scheme to defraud regulators and customers alike and reversed years of success for Volkswagen diesel motor vehicles in the United States market.  From 2009 to 2015, Volkswagen had sold or leased through its franchise dealers in the United States

nearly 580,000 dirty diesels that Volkswagen's defeat device disguised as clean (the "Affected Vehicles").  The success of the Volkswagen brand, in no small part due to the popularity of the Affected Vehicles, allowed Volkswagen to require substantial facility investments from existing and prospective franchise dealers and caused existing and prospective franchise dealers to pay substantial premiums for franchise rights.

40. However, following the issuance of the NOV, the value of the Affected Vehicles plummeted.  And, the Volkswagen brand's value is diminished through lost sales and service revenue and lost contractual relationships with present and future customers.  Further, VW-brand dealerships are not as popular, profitable or as worthwhile an investment as they once were. Finally, the Westerville LOI is not as valuable as it was when Mr. Kuhn negotiated for it in return for operating the New Port Richey VW dealership nor is it worth what was when originally issued to DAM in August 2013.  These losses are direct and quantifiable harms to DAM.

41. As detailed in the NOV, it was discovered that since at least 2009 certain VW-branded diesel automobiles were equipped with illegal "defeat devices" that enabled these automobiles to fraudulently pass emissions testing and obtain EPA Certificates of Conformity ("COC"), a necessity for sale in the United States.  This conspiracy to circumvent EPA regulations and defraud consumers and dealers alike would become known as "Dieselgate."

42. As part of Dieselgate, defeat devices were installed on the following VW-brand automobiles: 1) VW Jetta 2.0 Liter Diesel Models from 2009-2015; 2) Volkswagen Jetta SportWagen 2.0 Liter Diesel Models from 2009-2014; 2) Volkswagen Beetle 2.0 Liter Diesel Models from 2012-2015; 3) Volkswagen Beetle Convertible 2.0 Liter Diesel Models from 2012-2015; 4) Volkswagen Golf 2.0 Liter Diesel Models from 2010-2015; 5) Volkswagen Golf SportWagen 2.0 Liter Diesel Models in 2015; 6) Volkswagen Passat 2.0 Liter Diesel Models from

2012-2015; and, 7) Volkswagen Touareg 3.0 Liter Diesel Models from 2009-2016 (hereinafter, collectively the "Affected Vehicles").

43. Dieselgate's roots can be traced back to the mid-2000s.  The United States government had announced tougher emission regulations and environmentally-friendly automobiles such as the Toyota Prius were resounding successes.  Volkswagen, seeking to greatly increase its market share in the U.S., wanted to piggy-back on the recent breakthrough success of the Prius and other vehicles, while offering a more "fun-to-drive," high performance automobile.  Its solution was a newly-developed and sophisticated diesel engine, the EA189 TDI.

44. The EA189 TDI was billed as a "clean," "green," and environmentally-friendly high-performance engine option.  Until then, diesel engines were most closely-associated with the thick, toxic smoke they emitted.  Volkswagen set out to change that image with creative advertising and breakthrough innovation in emissions controls.

45. Internally, though, Volkswagen's engineers quickly realized making the EA189 TDI "clean" and compliant with EPA regulations would be much tougher than they envisioned.  The CEO of VWAG, Martin Winterkorn, tasked two engineers, formerly of Audi AG, Ulrich Hackenberg and Wolfgang Hatz, with developing the technology to support a diesel engine that maintained performance of traditional gasoline engines with reduced $CO_2$ emissions, lower gas mileage, and met new, strict $NO_X$ emission standards in the U.S.

46. Diesel engines are inherently more fuel efficient than traditional gasoline engines.  But, their fuel efficiency comes at the cost of air pollution and emissions.  Diesel emissions produce very high levels of $NO_X$.  $NO_X$ emissions can be reduced by tweaking the engines, but that, in turn, produces soot, a similarly-undesirable hydrocarbon emission.  Diesel engines exist in a state of balance between these conditions, known as "rich" and "lean" states.  A diesel engine in a rich

state contains more fuel than air, which in turn tends to burn off less fuel and thereby produces higher amounts of soot, reduced fuel efficiency, and sluggish driving performance.  On the other hand, the lean state contains more air than fuel and produces higher amounts of $NO_X$.  Both states produce harmful emissions and for the EPA to designate a diesel car as a "clean" vehicle, it must produce both low soot and low $NO_X$.

47. Beginning in 2007, the EPA and the California Air Resources Board ("CARB") promulgated stricter $NO_X$ emission standards, which required all diesel vehicles to produce 90% less $NO_X$ than years prior.  This development and its coinciding with Volkswagen's "clean" diesel push into the United States presented substantial obstacles to Volkswagen's U.S. strategy.

48. Volkswagen explored two options for solving the emissions challenge: a system employing selection catalytic reduction ("SCR"), or the use of a lean $NO_X$ trap ("LNT").  The SCR approach was promising, but expensive.  It worked by injecting urea into a diesel vehicle's exhaust stream to react with the $NO_X$, converting it into harmless nitrogen and oxygen.  On the other hand, the LNT was cheaper.  LNT involved storing $NO_X$ emissions in a separate compartment during vehicle operation until it was full.  At this point, the system would burn off the stored $NO_X$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then burned the $NO_X$ into nitrogen and oxygen.  In addition to being cheaper, this option was also less effective and resulted in lower fuel efficiency.  VW leadership fractured over this vitally-important decision, with the LNT system ultimately winning the day.

49. Ultimately, though, Volkswagen engineers ran out of time to develop an LNT system that could accomplish their lofty aims.  Feeling the now-notorious internal pressure from a former chief executive and management team that created a "culture where performance was driven by fear and

intimidation" engineers decided to cheat to ensure that the "clean" diesel engines met U.S. emissions standards within the window in which VW sought to ramp up its U.S. sales and presence.

50. Volkswagen executives and engineers devised the solution contained within the "defeat device." The "defeat device" was born from technology Volkswagen had used for years in Europe on Audi diesel engines to reduce noise. It was known as "Acoustic Function" or, in German, the "Akustikfunktion." Starting in the mid-2000s, Volkswagen engineers working with Bosch Diesel Systems (at both Bosch GmbH and Bosch LLC, as explained above) – as detailed further below – and with the knowledge of management, adapted Audi's "akustikfunktion" concept to the 2.0-liter and 3.0-liter diesel engines for Volkswagen and Audi models to be sold in the U.S.

51. On or about May 17, 2006, a VW engineer emailed employees in the VW Brand Engine Development department and described aspects of the software. He cautioned against using it in its current form because it was nothing more than a mechanism to detect, evade and defeat U.S. emissions cycles and tests. As he explained (in German): "within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US '07-data set. This function is pure [cycle-beating] and can like this absolutely not be used for US '07." But, VW executives refused to heed this warning.

52. VW executives, including Richard Dorenkamp (Head of VW's Engine Development After-Treatment Department) and Jens Hadler (Head of VW Brand Engine Development and Head of Diesel Engine Development), authorized the creation and installation of this software with the knowledge that it was a defeat device. It has been reported that the decision to cheat the EPA, CARB, and countless other regulators was an "open secret" in VW's engine development department, as it was necessary in order for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted." With the knowledge and assistance of Bosch

GmbH, the resulting defeat device was incorporated into the software operating the TDI engines in the Affected Vehicles.

53. The defeat device that Defendants installed in the Affected Vehicles to evade emission testing is software code residing in the vehicles' electronic control unit.  All modern engines are integrated with sophisticated computer components to manage the vehicle's operation.  In diesel vehicles, this software is known as electronic diesel control ("EDC").  The EDC installed in the Affected Vehicles is formally referred to as the Electronic Diesel Control Unit 17 (also known as "EDC Unit 17," "EDC 17," and "EDC17").

54. EDC17 is used in a number of different manufacturers' automobile models.  Bosch GmbH and Bosch LLC, through their employees in the Bosch Diesel Systems group, work with each manufacturer that uses the EDC17 to create a unique set of specifications and software code to manage the vehicle's engine operation.  Bosch GmbH and Bosch LLC are highly protective of the proprietary code and programming that operate the EDC17.  Bosch GmbH has detailed agreements with manufacturers that govern the use, modification, and programming of the EDC17, which prevents manufacturers from making modifications to the EDC17 that are not known, approved, and tested by Bosch GmbH.

55. Bosch's EDC17 controls emissions by periodically reading sensor values, evaluating control functions, and controlling actuators based on the control signal.  Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.

56. All Bosch EDCs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control.  In fact, the software is typically locked to prevent customers, like Volkswagen, from making significant changes on their own.

Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

57. The EDC17, as programmed, is a defeat device installed on the Affected Vehicles to surreptitiously evade emissions regulations.  Bosch GmbH, Bosch LLC and Volkswagen worked together to develop and implement a specific set of software algorithms for implementation in the Affected Vehicles, including algorithms to adjust fuel levels, exhaust gas recirculation, air pressure levels, and urea injection rates in vehicles equipped with SCR systems.[1]

58. The EDC17 in the Affected Vehicles was programmed to recognize when a vehicle was undergoing emissions testing based on the specific, required engine machinations for proper emissions testing in the U.S.  When the EDC17's algorithm detected that the vehicle was on a dynamometer (and, therefore, undergoing an emission test), software code within the EDC17 downgraded the engine's power and performance and upgraded the emissions control system's performance by switching to a "dyno calibration," temporarily reducing emissions to legal levels. Once the EDC17 detected that the emissions test was complete, it would then enable a different "road calibration" that caused the engine to return to full power and efficiency while reducing the emissions control systems' performance, and consequently, caused the car to spew up to forty (40) times the legal limit of $NO_X$ emissions.

59.  This workaround was illegal.  And, according to the New York Attorney General, Volkswagen management knew the use of these devices to detect the test and change the calibrations was illegal, as they studied the issue extensively during 2006-2007 when preparing to launch their vehicles in the U.S. market.

---

[1] Some later models of the Affected Vehicles had SCR emission systems rather than LNT systems.  But no matter the emissions system, all the Affected Vehicles employed "defeat devices."

60. On or about October 5, 2007, Jens Hadler presided over a contentious meeting regarding the trajectory of Volkswagen's plan to increase U.S. market penetration. Technical problems had led to internal disagreements among members of the VW Group team responsible for ensuring vehicles met U.S. emissions standards. At the conclusion of the meeting, Hadler authorized Richard Dorenkamp to proceed with the project knowing it was only through the use of the defeat device software that the vehicles could hope to pass U.S. emissions tests. And, on or about October 17, 2007, slides containing explicit engineering terms for the defeat device were sent to Mr. Hadler and other executives. Hadler responded (in German) "[w]e shall never present this anywhere and will also not distribute it."

61. The Clean Air Act ("CAA") expressly prohibits "defeat devices," defined as any auxiliary emissions control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 861.803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and explanation of why the control device is not a defeat device.

62. Thus, in order to obtain the COCs necessary to sell their vehicles, Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and performance-altering

software code that it developed with engineers from IAV[2], Bosch GmbH and Bosch LLC within the EDC17 from government regulators, thus making that software an illegal "defeat device."  In other words, Volkswagen lied to the government, its franchise dealers, both existing and prospective, consumers and the public at large.  And at every step of the way, Bosch Diesel Systems, through its employees at Bosch GmbH and Bosch LLC, knew and aided in the fraud.

63. Because the COCs were fraudulently-obtained, and because the Affected Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Affected Vehicles were never covered by a valid COC, and thus, were never legal for sale, nor were they EPA and/or CARB compliant, as represented.  Volkswagen and Bosch Diesel Systems (in particular employees at Bosch LLC, which appeared to take the lead for Bosch Diesel Systems in interactions with regulators in the United States) hid these facts from the EPA, other regulators, prospective and existing franchise dealers, and consumers.  Volkswagen continued to sell and lease the Affected Vehicles through franchise dealers to the driving public despite their illegality, and with the complicity of Bosch.

64. Notably, these continuing sales and leases made Volkswagen appear to be selling more cars, growing its market share in the U.S., and a much more attractive and lucrative investment for prospective franchise dealers, like DAM.  Also, these continued sales and leases inflated the expected profits that DAM used in evaluating how much land to obtain, how big a facility to build, how much inventory it needed to house, how much service business it could expect, and ultimately, how profitable it could expect the Westerville VW dealership to be.

---

[2] IAV GmbH ("IAV") is a limited liability company headquartered in Berlin, Germany.  IAV is an engineering company in the automotive industry that designs products for powertrain, electronics and vehicle development. Volkswagen is an IAV client.  IAV Automotive Engineering Inc. is a subsidiary of IAV based in the U.S.  IAV employees were part of the working group that included Bosch GmbH, Bosch, LLC, VW Group and VWAG employees that had a common purpose of designing and implementing a defeat device in U.S.-based diesel Volkswagens.  IAV is not named as a defendant in this matter.

65. James Robert Liang was a member of Volkswagen's development department from 1983 to 2008 and then Leader of Diesel Competence for VW Group from 2008 to 2015. Liang was indicted by a federal Grand Jury for his role in the Volkswagen-IAV-Bosch conspiracy. In pleading guilty to fraud and other charges, Liang admitted that he and several co-conspirators knowingly designed, authorized, and managed the production of an EA 189 diesel engine that could only comply with U.S. emissions standards by using an illegal defeat device. He and others knowingly attended meetings with the EPA in Ann Abor, Michigan on or around October 3, 2006, and with CARB in El Monte, California on or around October 5, 2006, where they presented the engine as one which complied with U.S. emissions standards to obtain COCs.

66. Similarly, Mr. Liang and Mr. Dorenkamp met with EPA officials in Ann Arbor on or around March 19, 2007, and with CARB officials on or around March 21, 2007, to summarize the EA 189 engine design and proposed operation of emissions control systems, while concealing its defeat device.

67. Volkswagen's illegal workaround was enabled by its close partnership with Bosch Diesel Systems, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in Volkswagen's diesel vehicles. Bosch Diesel Systems employees at both Bosch LLC and Bosch GmbH were well aware that Volkswagen was using its emissions control components as a defeat device and, in fact, worked with Volkswagen to develop the software algorithm specifically tailored to the Affected Vehicles.

68. Each Bosch entity, through the cross-entity Bosch Diesel Systems group, played a critical role in the scheme to evade U.S. emission requirements in the Affected Vehicles. In a letter to Volkswagen in 2007, Bosch GmbH acknowledged that use of the defeat device software was illegal. In 2008, Bosch GmbH wrote Volkswagen and expressly demanded that Volkswagen

indemnify Bosch (the specific entity was referred to by Bosch GmbH as "Bosch") for anticipated liability arising from the use of the Bosch-created "defeat device" (Bosch GmbH's words), which Bosch GmbH knew was "prohibited pursuant to … US Law." Volkswagen apparently refused to indemnify Bosch GmbH, but Bosch GmbH nevertheless continued to develop and deliver the so-called "akustikfunktion" (the code name used for the defeat device) for Volkswagen for another seven years. During that period, Bosch GmbH and Bosch LLC concealed the defeat device in communications with U.S. regulators once questions were raised about the emission control system in the Affected Vehicles, and Bosch Diesel Systems, through employees at Bosch LLC, went so far as to actively lobby regulators to promote Volkswagen's "Clean Diesel" system in the United States. Bosch LLC's efforts, taken together with evidence of Bosch LLC and Bosch GmbH's actual knowledge that the "akustikfunktion" operated as an illegal defeat device, demonstrate that Bosch LLC and Bosch GmbH were both knowing and active participants in the decade-long illegal enterprise to defraud U.S. consumers, regulators, franchise dealers.

69. Bosch's EDC17 was the technology behind Volkswagen's ambition. The EDC17 and the development of its underlying software were integral to Volkswagen's entire diesel strategy, which by late 2006 included creating software to sense when the vehicles were in test mode and then manipulate the emission control system at that time. This could not have been accomplished without years of collaborative work with Bosch Diesel Systems employees at both Bosch GmbH and Bosch LLC. In fact, customizing a road-ready EDC, like the EDC17, is an intensive three to five-year endeavor involving a full-time Bosch Diesel Systems presence at an automaker's facility. Bosch Diesel Systems and its customers work so closely together that it purposefully locates its component part manufacturing facilities close to its carmaker customers' manufacturing plants.

70. In summary, as the EA 189 project moved to series production in 2009, Bosch GmbH's documented role was to provide to Volkswagen executable software for installation in the EDC17 controller at the VW production line. Bosch Diesel Systems insisted that it control the definition of the EDC17 software, test the software using bench top and vehicle testing, produce the final software release for series production, and deliver the software to Volkswagen for installation in the EA 189 engines used in the Affected Vehicles.

71. Top VW executives Denner, Winterkorn, Horn, Muller, and Stadler were also in on the defeat device "secret." Notes from a May 28, 2014, meeting between Bosch and Volkswagen executives at VW headquarters reflect that the topic of "akustikfunktion" was discussed in the context of Volkswagen's and Bosch's partnership in the U.S. market. VWAG's Friedrich Eichler (Powertrain Development Chief) mentioned the importance of the "akustikfunktion" in Bosch diesel engines. Bosch GmbH also had participants at the meeting including Mr. Denner.

72. All Defendants were integrally involved in concealing the illegal use of the defeat devices to fraudulently obtain COCs from the EPA and their equivalent from CARB. Employees of Defendants presented at conferences, communicated with regulators, conducted testing, accepted awards for the "green" diesel technology, and continually updated and refined the "defeat devices" to evade detection.

73. Volkswagen advertised extensively to perpetuate the fraud. Affirmatively referring to its cheating TDI engines as the "world's cleanest diesel engines" on the "Environment" tab of its website and touting the allegedly-reduced $CO_2$ emissions on its "Clean Diesel" tab through September 2015.

74. Volkswagen's advertisement of the "environmental friendliness" of "clean" diesel engines increased its market share in the United States allegedly because its Clean Diesel models were

extraordinarily clean, EPA-certified in all 50 states, and powerful.  This artificially inflated the value of the brand, and therefore, the value of any potential new VW-brand dealership like DAM was awarded with the Westerville LOI.  And, with the brand value artificially-inflated, Volkswagen could demand substantial capital investment expenditures in return for the right to operate a VW-brand dealership.  DAM relied upon this inflated brand value in assessing the anticipated (and expended) capital investment to open the proposed Westerville VW dealership versus its potential profitability.

75. Upon information and belief, employees at VW knew of the unraveling fraud since at least early 2014, but did not share this information with existing or prospective VW-brand franchise automobile dealers.  In May 2014, West Virginia University published results of a study that found that certain of the Affected Vehicles' real world $NO_X$ and other emissions exceeded the allowable EPA emission standards ("WVU Study").  This would be the beginning of the end for Volkswagen and Bosch, but they would not go lightly.

76. In fact, Volkswagen continued to take steps to actively conceal the fraud from the public, both existing and prospective franchise dealers, and regulators.  When regulators learned of the results of the WVU Study, they came to Volkswagen for an explanation.  Volkswagen, rather than coming clean and admitting what it already knew, denied the allegations and blamed allegedly-faulty testing procedures in the WVU Study.  Internal communications at the time show that Volkswagen knew this to be an untrue explanation and that its employees as high up as the CEO of VW Group were still actively seeking to conceal the existence of the defeat devices.  Further, on or about October 1, 2014, VW employees gave a presentation to CARB regarding the WVU Study results and discrepancies identified in $NO_X$ emission between dynamometer testing and road driving.  In responding to questions, VW employees did not reveal that the existence of the defeat

device explained the discrepancies in $NO_X$ emissions. Instead, they gave CARB false reasons for the discrepancies in $NO_X$ emissions, including driving patterns and technical issues.

77. Then, in December 2014, Volkswagen issued a recall purportedly to update emission control software in the Affected Vehicles. CARB and the EPA conducted follow-up testing of the Affected Vehicles in the laboratory and during normal road operation. CARB discovered that none of the technical issues identified by Volkswagen explained the $NO_X$ emission test results. For months, internal communications between Volkswagen employees evidence a struggle for "creative" responses or "plausible explanations" to inquiries from regulators.

78. This internal struggle culminated at an August 19, 2015, meeting with CARB officials in California. In contravention of VW's directives and scripts prepared for its employees attending the meeting, a VW employee disclosed that VW diesel vehicles used different emissions treatment depending on whether the vehicles were on the dynamometer or on the road, thereby effectively admitting that VW had cheated U.S. emissions tests.

79. On the same day, back in Germany, some executives and engineers began deleting documents relating to U.S. emissions. Mr. Hadler told an assistant to dispose of a hard drive containing emails from him and other supervisors. In fact, from around August 2015 through around September 2015, approximately forty (40) or more VWAG and Audi employees altered, concealed, or destroyed or caused to be altered, concealed or destroyed thousands of documents. In September 2015, at least two VWAG employees contacted Bosch employees and asked them to delete documents relating to the defeat device and emissions of diesel vehicles.

80. Finally, on September 3, 2015, Volkswagen employees finally disclosed at a meeting with the EPA and CARB that it had installed a sophisticated software algorithm on the 2.0-liter Affected Vehicles, which could detect when the car was undergoing emission testing on a test bench and

switch the car into a cleaner running mode. During that meeting, Volkswagen admitted that the software was a "defeat device" forbidden by the CAA and state regulations. The First NOV would be issued about two weeks later.

81. However, Volkswagen continued to sell its 3.0-liter diesel models, despite similar, but no-yet-disclosed defeat devices being installed. Only after the Second NOV in November 2015 did Volkswagen finally bring an end to its fraudulent enterprise.

82. By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than what was certified to the EPA, and higher levels than state and federal regulations allow, Volkswagen violated the Clean Air Act and state environmental regulations, defrauded its existing and prospective VW-branded franchise dealers, engaged in a criminal racketeering enterprise and engaged in unfair competition under state and federal law. Bosch was complicit in the fraud and criminal racketeering enterprise too.

83. Further, despite Volkswagen's public statements, its executives knew of this fraud. On October 17, 2015, Reuters reported that anonymous insiders, including a Volkswagen manager and a U.S. official close to the government's investigation of the company, claimed that Volkswagen made several modifications to its emission defeat device software over the seven years the company has admitted to cheating. Such incremental updates to the software, which were made to accommodate new generations of engines during that timeframe, evidence a large group of employees making an ongoing effort to continue their deception. And, as detailed above, these modifications would have almost assuredly have been coordinated by and involved employees at Bosch Diesel Systems.

84. On January 4, 2016, the Department of Justice ("DOJ"), on behalf of the EPA, filed a civil complaint against VWAG, VW Group, Volkswagen Group of America Chattanooga Operations

LLC, Audi AG, Audi, Porsche AG and Porsche America for injunctive relief and the assessment of civil penalties for their violations of the CAA.  In addition to alleging various violations of the CAA, the complaint states that the Defendants impeded the government's efforts to learn the truth about the emission irregularities related to the Affected Vehicles with material omissions and misleading information.

85. The DOJ also launched a criminal investigation into Volkswagen and several of its executives over the emissions cheating scandal.  VW has been charged criminally and it pleaded guilty.  In its plea agreement with DOJ, VWAG admitted to knowingly conspiring to commit wire fraud by materially misrepresenting Affected Vehicles compliance with the CAA and that they did so to defraud the buyers and lessees of those vehicles.  VWAG also stipulated to certain factual allegations in Exhibit 2 of the plea agreement, which it agreed it will "neither contest the admissibility of, nor contradict…in any proceeding."  The plea agreement is attached and those admissions contained in the statement of facts or Exhibit 2 to the plea agreement are incorporated by reference as though fully set forth herein. (**Exhibit D – Statement of Facts to Plea Agreement between Volkswagen AG and the United States of America dated March 10, 2017**).

86. When the NOV was announced in September 2015, DAM's Westerville LOI instantly lost value.  The VW brand is now seen as less reliable, certainly not "clean" or "green," and deceptive.  This perception devalued each existing dealership bearing the VW logo as well as those that were planned, but not yet open.  Therefore, the expected profitability that attached to the proposed dealership under the Westerville LOI has been significantly reduced.  The Westerville LOI was also no longer as valuable a commodity as Mr. Kuhn had expected when he did Volkswagen a favor in purchasing the New Port Richey dealership years prior.

87. This devaluation was exacerbated because the Affected Vehicles were sold at substantially higher premiums than the other offerings by Volkswagen.  Therefore, removing these "premium" models from the vehicle mix offered by Volkswagen significantly dented the profitability outlook for franchise dealers including DAM.

88. Subsequent to the public announcement of the fraud, VW Group took other actions that further devalued the potential profitability of existing and proposed VW dealerships, including, but not limited to, removing many of the Affected Vehicles from the road, a significant source of potential revenue for franchise dealers in the form of service and parts sales.

89. Further, but for the expected sales and service opportunities presented by the Affected Vehicles (or diesel models similar thereto), DAM would have reconsidered its acceptance of the Westerville LOI and the concomitant capital investments.  The popularity of the Affected Vehicles in no small part drove the perceived value of the Volkswagen brand and profits DAM could expect as a result of the Westerville LOI.

90. But, following the issuance of the NOVs in late 2015, DAM did not cease working towards fulfilling the milestones of the Westerville LOI.  Instead, DAM continued its efforts to fulfill the Westerville LOI.

91. Then, in February 2016, after DAM's architect submitted its final draft of the proposed Westerville VW dealership, Volkswagen requested that they start over.  Notably, this final draft was the result of significant back and forth between Volkswagen's architects, City of Westerville officials, DAM and its architects.  Despite all of this coordination, time and expense, Volkswagen was not satisfied and requested a complete redo.

92. Then, in April 2016, Volkswagen franchised motor vehicle dealers filed a class-action complaint against Volkswagen and Bosch for their losses from Dieselgate.

93. Subsequently, existing and prospective Volkswagen franchised dealers, including DAM's principal, Jason Kuhn, were in active negotiations to settle claims that the dealers had against Volkswagen relating to the fraud, lost revenue, lost franchise value, and lost value in the VW brand.

94. Jason Kuhn was one of the representatives leading negotiations for the class of VW dealers. Mr. Kuhn is the owner-operator of other existing VW-brand dealerships and is also the principal owner of DAM.  At the time, Mr. Kuhn was insisting upon including the prospective VW dealers (i.e., those with outstanding LOIs like DAM) in any global settlement by Volkswagen with the franchise dealers.

95. In August 2016, over dinner in Virginia near VW Group's headquarters, Mark McNabb, then the Chief Operating Officer of VW Group, told Mr. Kuhn, that he and Volkswagen preferred not to include the prospective VW dealers in the settlement class.  But, that he would "personally deal with the LOI dealers and make it right," which specifically included DAM, Mr. Kuhn's prospective VW dealership.

96. Based upon this representation, made in person once by Mr. McNabb and at least once over the phone, Mr. Kuhn decided not to push further for inclusion of LOI-dealers, including DAM, in the settlement class.  Thereafter, Volkswagen and Mr. McNabb did not "make it right" and have instead refused to compensate DAM for the loss in value of the Westerville LOI and its expenditures in reliance thereon, despite Mr. McNabb's representations to Mr. Kuhn regarding DAM and the other prospective VW dealers.

97. In addition to having to settle claims by existing and prospective dealers, Volkswagen was required to pay the United States Government as part of its criminal plea and also consumers that had purchased the fraudulently-certified Affected Vehicles.   The combination of all of these

settlements was a substantial sum of money even for a company the size of VW, totaling in the billions of dollars.

98. Before the settlement amount with the existing dealers was finalized, Volkswagen was indicating that the dealers should "not get greedy" because if the judgment or settlement amount was too large it had the possibility of sending Volkswagen into bankruptcy.

99. With the uncertainty surrounding the financial health of Volkswagen post-settlements, the bait-and-switch regarding LOI dealers' inclusion in the dealer settlement, the increasing costs to fulfill the Westerville LOI, and the severely diminished profitability outlook for both the Westerville VW dealership and the VW brand overall, DAM made a prudent business decision to mitigate its damages and stop spending money to fulfill the Westerville LOI.  In other words, DAM decided to "stop throwing good money after bad."

## TOLLING OF THE STATUTE OF LIMITATIONS

100.     DAM had no way of knowing about Volkswagen's deception with respect to its Clean diesel engine system and "defeat device."  It took the EPA and CARB investigations to uncover Volkswagen's deception, which involved sophisticated software manipulation by all Defendants.  As reported in media outlets, it took CARB testing on a special dynamometer in a laboratory, open road testing using portable equipment, and the use of special testing devised by CARB to uncover Volkswagen's scheme and to detect how software on the engine's electronic control module was deceiving emissions certifications tests.  Quite simply, Volkswagen was intent on expressly hiding its behavior from regulators and consumers and therefore, the application of the discovery tolling rule is applicable.

101.     Within the time period of any applicable statute of limitations, DAM could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing the

conduct complained of herein and misrepresenting its true position with respect to the emissions of the vehicles.

102.     DAM did not discover, and did not know of facts that would have caused a reasonable person to suspect that Volkswagen did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Volkswagen had information in its possession about the existence of its sophisticated emissions scheme and that it opted to conceal that information.  Nor in any event would such an investigation on the part of DAM have disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust that DAM had placed in its representations, or that, necessarily, Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of emissions and the emissions software of its vehicles, or of Volkswagen's emissions scheme.

103.     For the reasons laid out in paragraphs 100-102, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims for all Affected Vehicles identified herein.

104.     All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

105.     Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the subject vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

106.     Volkswagen is also estopped from relying on any statutes of limitations defense in this action.

107.     Volkswagen was under a continuous duty to disclose to DAM the true character, quality, and nature of emissions from the Affected Vehicles, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

108.     Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions of the Affected Vehicles.

109.     Volkswagen was also under a continuous duty to disclose to DAM that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air standards, and that it systematically devalued compliance with and deliberately flouted, federal and state laws regulating vehicles emissions and clean air.

## COUNT I – FRAUDULENT CONCEALMENT

110.     Plaintiff DAM realleges and incorporates paragraphs 1 through 109 as if fully set forth herein.

111.     Volkswagen intentionally concealed that the Affected Vehicles were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied DAM information that is highly relevant to its business decisions, including whether to accept the Westerville LOI, take actions towards purchasing the associated real property and constructing the dealership, and other actions to fulfill the Westerville LOI.

112.     Volkswagen knew these representations were false when made.

113.     Volkswagen knew these representations to be untrue since at least 2014.

114.     The Affected Vehicles, key models for the VW-brand and any prospective VW dealership, were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because they contained faulty and defective Clean Diesel engine systems, as alleged herein.

115.     Volkswagen had a duty to disclose that these Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective Clean Diesel engine system, because DAM relied on Volkswagen's material representations that the Affected Vehicles were safe, environmentally clean, efficient, free from defects and that these Affected Vehicles would be available for purchase as inventory, offered for sale, and available to be serviced at the proposed VW dealership under the Westerville LOI.

116.     The aforementioned concealment was material because if it had been disclosed, DAM would not have accepted the Westerville LOI, sought to enter into a franchise agreement for the proposed Westerville dealership, expended substantial sums in preparing to open a Westerville VW-brand dealership, and/or valued the Westerville LOI and its VW-brand dealership at a level to make the investment worthwhile.

117.     The aforementioned representations were also material because they were facts that would typically be relied on by a person interested in opening and operating a dealership (i.e., what type and mix of products will be offered for retail sale).  Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for the Affected Vehicles to pass EPA emissions requirements.  Volkswagen intentionally made the false statements to, among other things, entice DAM to enter into the Westerville LOI so that Volkswagen could ultimately sell more automobiles, including the Affected Vehicles.

118.     Volkswagen and its employees intended this representation to preserve its franchised motor vehicle dealership network in the United States, including keeping existing franchised motor vehicle dealers from divesting themselves of franchises and inducing potential, new franchised dealers to invest heavily in opening new VW-branded outlets.

119.     DAM relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the Clean Diesel engine system and Volkswagen's affirmative assurance that its Affected Vehicles were safe and reliable, and other similar false statements – in seeking to open another VW-brand dealership, in entering into the Westerville LOI, in taking expensive steps to fulfill the Westerville LOI, and ultimately in seeking to enter into another franchise agreement to open a Westerville VW-brand dealership.

120.     As a result of its reliance, DAM has been injured in an amount to be proven at trial, including, but not limited to: their lost benefit of the bargain and their expenditures to fulfill the Westerville LOI; and/or the diminished value of DAM's potential dealership franchise, the Westerville LOI, and the real property related thereto.

121.     Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of DAM.  DAM is therefore entitled to an award of punitive damages.

WHEREFORE DAM seeks:

   (a) Compensatory damages as proven at trial

   (b) Treble and punitive damages as allowed under law and as proven at trial;

   (c) any other relief that this Court deems just and appropriate.

## COUNT II – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

122.     Plaintiff DAM realleges and incorporates paragraphs 1 through 109 as if fully set forth herein.

123.     Florida's Deceptive and Unfair Trade Practices Act, § 501.201, Fla. Stat. (hereinafter, "FDUTPA") is expressly intended to protect "persons" from potentially misleading, deceptive or unfair trade practices.

124.     VW Group and VWAG are both "persons" within the meaning of FDUTPA and, at all times material hereto, were subject to the requirements and proscriptions of FDUTPA with respect to all its business and trade practices prescribed herein.

125.     DAM is a "person" damaged and "likely to be damaged" by Volkswagen's deceptive trade practices within the meaning of FDUTPA.  As a Florida corporation with its principal location in Tampa, Florida, DAM is protected by FDUTPA.

126.     Volkswagen's unlawful conduct as described in this Complaint emanated from Volkswagen's trade or commerce to the detriment of DAM.

127.     Volkswagen deceptively and unfairly placed "defeat devices" on the Affected Vehicles thereby allowing them to receive emissions-certification in the United States and be otherwise viable and marketable as new automobiles to American consumers.  The "defeat devices" allowed Volkswagen to deceptively appear to increase its sales of the Affected Vehicles, making a new VW dealership appear to be a stronger investment than it actually was.

128.     Further, Volkswagen was deceptive in failing to disclose to DAM the existence of the "defeat devices" and their potential implication on Volkswagen's business, the profits DAM could expect in operating a new VW dealership, and other considerations related to DAM's investment in the Westerville LOI.

129.     As a result, opening a VW-brand motor vehicle dealership in Westerville, Ohio, appeared to be a strong investment for DAM, because among other reasons, the Affected Vehicles had very strong consumer demand.

130.     Once the deception perpetrated by the "defeat devices" became clear, VW-branded motor vehicles and their corresponding franchised dealerships were no longer a strong investment or use of capital.

131.     Therefore, DAM made to the decision to not fulfill the Westerville LOI, costing it hundreds of thousands of dollars in design, construction, and other associated costs.

132.     These damages are a direct result of the deceitful and unfair acts of Volkswagen.

133.     Illegally placing "defeat devices" in the Affected Vehicles and selling them throughout the United States to artificially inflate VW's brand value and DAM's expected profits from the Westerville LOI is a deceptive act under FDUTPA.

WHEREFORE DAM seeks:

(a) Compensatory damages as proven at trial;

(b) Treble and punitive damages as allowed under law and as proven at trial;

(c) Attorneys' fees and related litigation expenses, including prejudgment interest and costs;

(d) any other relief that this Court deems just and appropriate.

## COUNT III – BREACH OF CONTRACT

134.    Plaintiff DAM realleges and incorporates paragraphs 1 through 109 as if fully set forth herein.

135.    Subsequent to the NOVs' issuance by the EPA, DAM contemplated ceasing its activities in fulfillment of the Westerville LOI due to the damage caused to VW's brand by the scandal related to the "defeat devices."

136.    Jason Kuhn expressed DAM's concerns regarding the value of the new Westerville VW-branded dealership to Volkswagen.

137.    Volkswagen, including Mark McNabb, assured Mr. Kuhn, DAM's principal, that any prospective dealers with LOIs, like DAM, would be compensated in the settlement of claims by current dealers against Volkswagen.

138.    This promise by Volkswagen and DAM's concomitant agreement to continue working to fulfill the conditions of the Westerville LOI constitute a new, verbal agreement between Volkswagen and DAM.

139.    DAM fully and faithfully performed its duties and obligations under this verbal agreement.

140.    Volkswagen breached the verbal agreement by not including DAM in its settlement of claims by current dealers against Volkswagen.

141.    DAM has suffered damages as a result of Volkswagen breach of this agreement.

WHEREFORE Plaintiff DAM seeks:

(a) A judgment awarding compensatory damages; and

(b) Such further relief as this Court deems just and appropriate.

(c)

## COUNT IV – PROMISSORY ESTOPPEL

142.     Plaintiff DAM realleges and incorporates paragraphs 1 through 109 as if fully set forth herein.

143.     Alternatively to Count III, if the discussions and agreement between DAM and Volkswagen is not found to be an enforceable verbal contract, it is enforceable in promissory estoppel.

144.     Volkswagen promised to Mr. Kuhn that DAM would be included in any settlement of claims by existing dealers against Volkswagen arising out of Dieselgate.

145.     Volkswagen knew or reasonably should have known that this promise would induce DAM to continue to work to fulfill its commitments under the Westerville LOI, rather than cutting its losses due the diminished value of the VW-branded dealership the Westerville LOI provides for.

146.     DAM continued to expend money and effort in furtherance of its fulfillment of the Westerville LOI and forewent stopping design and construction activities that were not economically-feasible in light of the reduced value of a VW-brand franchise, but for DAM being included in the settlement for its Westerville LOI.

147.     As a result of its reliance on Volkswagen's promise, DAM suffered damages and was ultimately not compensated by Volkswagen as part of its settlement of claims arising from Dieselgate.

WHEREFORE Plaintiff DAM seeks:

(a) A judgment awarding compensatory damages; and,

(b) Any further relief this Court deems just and appropriate.

## COUNT V – VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

148.     Plaintiff DAM realleges and incorporates paragraphs 1 through 109 as if fully set forth herein.

149.     DAM brings this Count against Defendants Volkswagen AG, Volkswagen Group of America, Inc., Robert Bosch GmbH, Inc., and Robert Bosch LLC (collectively, "RICO Defendants").

150.     The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

151.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate" any of the RICO provisions.

152.     For many years, the RICO Defendants have aggressively sought to increase the sales of Affected Vehicles in an effort to bolster revenue, augment profits and increase Volkswagen's share of the diesel vehicle market.  Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy.  In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose to deceive the regulators and the public into believing the Affected Vehicles were "clean" and "environmentally friendly."  As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate §§ 1962(c) and (d).

153.     Upon information and belief, the Emissions Fraud Enterprise consisted of the entities named as Defendants in this matter as well as those individuals specifically named below.

154.     The Volkswagen Defendants include Volkswagen AG and Volkswagen Group of America.  Although each Volkswagen Defendant is a distinct legal entity, VW Group is wholly-owned and controlled by Volkswagen AG.

155.     As noted previously, in 2007, the Volkswagen Defendants made it their mission to become the dominant automotive manufacturing conglomerate in the world.  At the time they articulated this goal, however, the Volkswagen Defendants were struggling to retain their foothold in the American market.  Their strategy of wooing customers with premium products was not paying off and Volkswagen's costly plant in Chattanooga, Tennessee was "woefully underutilized."

156.     In response to these obstacles, VWAG and its leader, Martin Winterkorn, set in motion an ambitious plan to triple the Volkswagen Defendants' sales in the United States.  The linchpin of this strategy was increasing sales of "diesel-powered cars… [and] promising high mileage and low emissions without sacrificing performance."

157.     Additionally, to achieve its lofty sales goal, the Volkswagen Defendants made a business-driven decision to move away from selective catalytic reduction ("SCR") emission control systems they had previously used in their vehicles and that were industry standard at the time.  Instead, they sought to replace the SCR systems with the less expensive and easier to maintain lean $NO_X$ trap ("LNT") systems.  Critically, however, the LNT technology the Volkswagen Defendants sought to implement had not been shown to effectively reduce toxic $NO_X$ emissions to lawful levels under normal operating conditions.

158.     Accordingly, working with the other members of the Emissions Fraud Enterprise, the Volkswagen Defendants devised a scheme to circumvent the United States' stringent emissions standards by incorporating a "defeat device" into their LNT emissions control system and their later TDI vehicles equipped with SCR emissions systems.  The "defeat device" automatically increases exhaust gas recirculations and activates emissions controls during testing conditions only.  Employing this technology, the Affected Vehicles routinely pass emissions tests even though in normal operating conditions when the emissions treatment is de-rated or disabled they emit unlawful levels of toxic pollutants into the atmosphere.

159.     Making matters worse, in order to profit from the scheme and increase their sales according to plan, the Volkswagen Defendants with the active participation of the Bosch Defendants, unabashedly billed the Affected Vehicles as "clean" and "environmentally friendly" vehicles.

160.     In sum, as part of their effort to become the dominant automotive manufacturing conglomerate in the world, the Volkswagen Defendants controlled and directed an eight-year-long enterprise whose purpose was to deceive regulators, existing and potential franchise motor vehicles, like DAM, and the public through lies and deception.

161.     Upon information and belief, the Volkswagen Defendants' leaders – including Martin Winterkorn, Ulrich Hackenberg, Frank Tuch, and Wolfgang Hatz – played central roles in the Emissions Fraud Enterprise's unlawful scheme.

162.     Winterkorn took the helm of Volkswagen AG in 2007 and was the chief architect of the Volkswagen Defendants' strategy to triple sales in the American market by relying more heavily on their purportedly revolutionary "clean" diesel offerings.

163.     Still, Winterkorn quickly realized his strategy could not succeed if the Volkswagen Defendants relied on the SCR technology they had used in their pre-2009 diesel vehicles and that all their competitors used on more expensive diesel offerings.  Winterkorn instead advocated an alternative course of action that enabled the Volkswagen Defendants to cut costs and offer the public lower-priced diesel vehicles.  To that end, he appointed Ulrich Hackenberg and Wolfgang Hatz, two former Audi engineers and members of the Emissions Fraud Enterprise, to lead the research and development facet of the "clean" diesel project.

164.     Despite Hackenberg and Hatz' best efforts, the technological hurdles were too formidable and a viable, lawful LNT-based system could not be found.  Although Winterkorn was routinely apprised of these obvious technical setbacks, he continued to pursue the aggressive cost-cutting, profit drive plan he had originally envisioned.  In doing so, he directly participated in the scheme to defraud regulators and consumers.

165.     On February 1, 2007, Hackenberg was appointed to Volkswagen's Brand Board of Development.  In this capacity, he was responsible for the technical development of all the Volkswagen Defendants' brands.

166.     On July 1, 2013, Hackenberg was appointed to the Board of Management of Audi AG and made responsible for its Technical Development department.  In this capacity, Hackenberg spearheaded the development of Audi's TDI "Clean Diesel" engines.  As he explained in a press release, his strategy for Audi's technical development included the following:

> [P]ushing forward with development in … our TDI engines in the USA – our clean diesel offensive is bearing fruit.  In China, too, we are already introducing the first clean diesel models and watching developments there very closely.  We also expect a great deal from g-tron technology, the most sustainable type of gas drive.

167.     Hackenberg's statement is illustrative of the Volkswagen Defendants' efforts to falsely bill Affected Vehicles as "clean," "environmentally friendly," and "fuel efficient" when the opposite was true.

168.     In 2010, Tuch was appointed head of quality control across several of the Volkswagen Defendants' brands.  Winterkorn hoped Tuch would move Volkswagen "forward in the USA."  Volkswagen's in-house magazine reported that Tuch and Winterkorn worked closely to honor that pledge, meeting "every Monday to discuss quality issues, often taking test drives in vehicles manufactured by the company."  In his role as head of quality assurance, Tuch was also intimately familiar with Volkswagen, Audi, and Porsche engines and transmissions.  Among his duties was "the development and production of components such as engines, transmissions, seats and suspension parts" for small, compact, midsize, and full-size product lines, including all the Affected Vehicles.

169.     Significantly, Tuch also oversaw "36 laboratory locations throughout the world in terms of training and auditing and also finds staff to fill laboratory manager positions," including the Volkswagen Defendants' laboratories in the United States, which were primarily responsible for emissions testing of the Affected Vehicles.

170.     On information and belief, Tuch knew the Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

171.     Hatz directed engine development for the Porsche, Audi and Volkswagen brands. In this role he supervised the development of the engines and transmissions for Affected Vehicles and had knowledge of their technical details.  On information and belief, Hatz knew the Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

172.     James Robert Liang is a Volkswagen engineer who pled guilty on September 9, 2016, to one count of conspiracy to commit wire fraud and to violate the Clean Air Act.  In connection with pleading guilty, Liang admitted that he helped his co-conspirators continue to lie to the EPA, CARB and Volkswagen customers even after the regulatory agencies started raising questions about the vehicles' on-road performance following an independent study commissioned by the International Council on Clean Transportation or the WVU Study, which showed that the diesel vehicles' emissions on the road were up to 40 times higher than shown on the dynamometer.

173.     The Bosch Defendants are Bosch LLC and Bosch GmbH.  Employees at Bosch LLC and Bosch GmbH who worked in the cross-entity Bosch Diesel Systems group tested, manufactured and sold the electronic control module ("ECM") that managed the emissions control system used by the Volkswagen Defendants in the Affected Vehicles.  This particular ECM is more formally referred to as the EDC17.

174.     Defendant Bosch GmbH is a multinational engineering and electronics company headquartered in Gerlingen, Germany, which has hundreds of subsidiaries and companies.  It wholly owns Defendant Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan.  As explained above, Bosch's sectors and divisions are grouped by subject matter, not location.  The Mobility Solutions (formerly Automotive Technology) is the Bosch sector at issue, particularly its Diesel Services group, and it encompasses employees of Bosch GmbH and Bosch LLC.  These individuals were responsible for the design, manufacture, development, customization, and supply of the defeat device to Volkswagen for use in the Affected Vehicles.  In addition, employees of Bosch LLC were actively involved in promoting fraudulent "clean diesel" technology, lobbying politicians, and communicating with state and federal regulators.

175.     Volkmar Denner has been Chairman and CEO of Bosch since July 2012, after decades of working Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that Volkswagen and Bosch GmbH modified to service as defeat devices.  Denner fostered Bosch's relationship with key corporate partners, such as Volkswagen, which brought in billions of dollars in annual revenue for Bosch GmbH.  Denner communicated directly with Winterkorn about products sold to Volkswagen.  In 2014, Denner met in person with Winterkorn at VWAG headquarters to discuss, among other topics, the "akustikfunktion" in diesel engines.

176.     Engineers and other employees at Bosch GmbH and Bosch LLC worked with Volkswagen to develop and implement a specific and unique set of software algorithms to surreptitiously evade emissions regulations.   Bosch GmbH customized their EDC17s for installation in the Affected Vehicles with unique software code to detect when vehicles were undergoing emissions testing, as described above.

177.     Bosch GmbH and Bosch LLC were well aware that the EDC17 would be used by Volkswagen to cheat on emissions testing.   Employees at Bosch GmbH even requested indemnification from Volkswagen for the expanded use of the EDC17.  Volkswagen refused, but Bosch GmbH continued shipping the modified software to Volkswagen for use in the Affected Vehicles for another seven years.   Bosch GmbH and Bosch LLC were also critical to the concealment of the defeat device in communications with U.S. regulators and went even further to actively lobby U.S. lawmakers on behalf of Volkswagen and its "Clean Diesel" vehicles.

178.     The emissions systems in the Affected Vehicles could not effectively lower $NO_X$ emissions to legal levels during normal operating conditions.  In order to pass the emissions test, then, the EDC17 equipped with a "defeat device," which is software that allows the vehicle to

determine whether it is being operated under normal conditions or testing conditions.   Under normal operating conditions, the software downgrades exhaust gas recirculations and shuts off the LNT or SCR after-treatment system thereby allowing the vehicle to perform with high power and efficiency, but also allowing many times more toxic pollutants than is allowable under law.   By contrast, under testing conditions, the software increases exhaust gas recirculation and turns on the LNT or SCR after-treatment system, which reduces the $NO_X$ emissions enough to pass the emissions test, but negatively impacts the vehicle's gas mileage and performance.

179.     Notwithstanding their knowledge that the Affected Vehicles could not be lawfully operated if the emissions system was disabled, the Bosch Defendants, driven to cement their position as a leading supplier of diesel emissions equipment, went on to sell approximately eleven million EDC17s to the Volkswagen Defendants over an eight-year period.

180.     Bosch GmbH's decision to continue the sale of EDC17s to the Volkswagen Defendants for years on end is remarkable considering that:

a.   Upon information and belief, the Bosch Defendants knew the "defeat device" was not necessary for any legitimate purpose.

b.   None of the varied emissions control systems the Bosch Defendants tested, manufactured, and sold to other diesel vehicle manufacturers relied on the same technology the Volkswagen Defendants were utilizing.   Indeed, the Volkswagen Defendants' competitors continued exclusively using the more expensive SCR technology.

c.   Even for SCR systems in Volkswagen's Gen2 and Gen3 SCR-equipped engine systems, the amount of exhaust fluid the system used and was able to store was too low for normal driving conditions, suggesting that the quality was calculated to meet just the testing time and not meant to be engaged during normal usage.

181.     Absent an extraordinary engineering breakthrough – for which there was no external evidence – the programming of the EDC17 presented a practical impossibility.  Bosch Diesel Systems, including employees at Bosch GmbH and Bosch LLC, as highly sophisticated actors in the engine control space must have known that the Volkswagen Defendants had not actually engineered revolutionary emissions control systems that enabled the Affected Vehicles to maintain performance, fuel efficiency, reduce emissions and reduce costs.

182.     IAV engineers were part of the enterprise that developed the emissions systems that contained a defeat device.  In the plea agreement of Volkswagen engineer Robert Liang, IAV is identified as "Company A" that aided and abetted Liang and other co-conspirators.

183.     On June 1, 2016, an indictment was filed in the United States District Court, Eastern District of Michigan, in *United States of America v. James Robert Liang*.  The indictment arises from Liang's role in VW's violations of the Clean Air Act and wire fraud and alleges that he and others at VW and elsewhere engaged in a conspiracy:

> The purpose of the conspiracy was for LIANG and his co-conspirators to unlawfully enrich VW and themselves by, among things, (a) deceiving U.S. regulators in order to obtain the necessary certificates to sell diesel vehicles in the United States; (b) selling VW diesel vehicles to U.S. customers knowing that those vehicles did not meet U.S. emissions standards; (c) deceiving U.S. customers by marking VW diesel motor vehicles as "clean diesel" knowing that those vehicles emitted $NO_X$ at levels well above U.S. standards; and (d) concealing the defeat device from U.S. regulators, VW customers, and the U.S. public.

184.     On September 9, 2016, Liang entered into a Plea Agreement for one count of wire fraud.  The factual basis of the plea supports the plausibility of the RICO claim set forth below and states in pertinent part:

> The following facts are a sufficient and accurate basis for defendant's guilty plea:

> From 1983 to May 2009, defendant JAMES ROBERT LIANG was an employee of Volkswagen AG ("VW AG"), working in VW AG's diesel development department in Wolfsburg, Germany.

In about 2006, LIANG and his co-conspirators began to design a new "EA 189" diesel engine. They soon realized, however, that the engine could not meet both customer expectations as well as new, stricter U.S. emissions standards. As a result, LIANG and his co-conspirators pursued and planned the use of a software function to cheat standard U.S. emissions tests (the "defeat device"). LIANG used the defeat device software while working on the EA 189 and assisted in making the defeat device software work. The co-conspirators needed to do so to obtain a certificate of conformity from the United States Environmental Protection Agency ("EPA") in order to sell vehicles in the United States. LIANG understood that EPA would not certify vehicles in the United States if EPA knew that the vehicles contained a defeat device.

In or around 2008, LIANG worked with his co-conspirators to calibrate and refine the defeat device. This defeat device recognized whether the affected VW diesel vehicles were undergoing standard U.S. emissions testing on a dynamometer or being driven on the road under normal driving conditions. The defeat device accomplished this by recognizing the standard drive cycles used in EPA's emissions tests. If the vehicle's software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. emissions standards for nitrogen oxide ("$NO_X$"). If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the vehicle's emissions control systems were reduced substantially, causing the vehicle to emit substantially higher amounts of $NO_X$, sometimes forty times higher than U.S. standards.

LIANG moved to the United States in May 2008 to assist in the launch of VW's diesel vehicles with EA 189 engines. From about May 2008 to the present, LIANG was the Leader of Diesel Competence for VW Group of America ("VW GOA"), a VW subsidiary. In that role, LIANG assisted in certification, testing, and warranty issues for VW diesel vehicles in the United States.

For each new model year of VW's diesel vehicles, VW employees met with EPA to seek the certifications required to sell the vehicles to U.S. customers. During one of these meetings, which LIANG attended personally in Ann Arbor, Michigan with EPA on March 19, 2007 and on March 21, 2007 with California Air Resources Board ("CARB"), LIANG participated as his co-conspirators described VW's diesel technology and emissions control systems in detail to the staffs of the EPA and CARB but intentionally omitted LAING and his co-conspirators' plan to include a defeat device in VW diesel vehicles. LIANG knew that VW was cheating by implementing the defeat device and that he and his co-conspirators were deceiving EPA in this meeting.

As part of the certification process for each new model year, including model years 2009 through 2016, LIANG knew his co-conspirators continued to falsely and fraudulently certify to EPA and CARB that VW diesel vehicles met U.S. emissions standards and complied with the Clean Air Act. During this time, LIANG and his co-conspirators knew that VW marketed VW diesel vehicles to the U.S. public as

"clean diesel" and environmentally-friendly, and promoted the increased fuel economy. LIANG and his co-conspirators knew that these representations made to U.S. customers were false, and that VW's diesel vehicles were not clean.

As VW's "clean diesel" vehicles in the United States began to age, they experienced higher rates of warranty claims for parts and components related to emissions control systems. Some of LIANG's coconspirators believed that the increased claims were a result of the vehicle in testing mode too long, rather than switching to "road mode." Because of these increased claims, LIANG worked with his co-conspirators to enhance the defeat device to allow the vehicle to more easily recognize when the vehicle was no longer in testing mode. LIANG knew that his co-conspirators falsely and fraudulently told U.S. customers and others that a software update in about 2014 was intended to improve the vehicles when, in fact, LIANG and his co-conspirators knew that part of the update was intended to improve the defeat device's precision in order to reduce the stress on the emissions control systems.

In the spring of 2014, a non-government organization published the results of a study which identified substantial discrepancies in the $NO_X$ emissions from certain VW vehicles when tested on the road compared to when these vehicles were undergoing EPA standard drive cycle tests on a dynamometer. Following the study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher $NO_X$ emissions in VW diesel vehicles on the road as opposed to the dynamometer. LIANG and his co-conspirators discussed how they could answer the regulatory agencies' questions without revealing the defeat device. LIANG knew that, after these discussions, his co-conspirators intentionally made fraudulent explanations to the EPA and CARB when providing testing results, data, presentations, and statements to the EPA and CARB by failing to disclose the fact that the primary reason for the discrepancy was the defeat device.

LIANG knew that his co-conspirators also falsely and fraudulently told U.S. customers, EPA, and CARB that voluntary recall in or around early 2015 was intended to "fix" the issues that were causing the discrepancy, when, in fact, LIANG and his co-conspirators knew that although the update lowered the $NO_X$ emissions in certain VW diesel vehicles on the road, the update did not remove the defeat device software that was the true reason for the discrepancy.

LIANG and his co-conspirators caused defeat device software to be installed in all of the approximately 500,000 VW diesel 2.0 liter light-duty passenger vehicles sold in the United States from 2009 through 2015.

185.    On January 11, 2017, Volkswagen AG plead guilty to federal conspiracy, fraud and

false statements in connection with its role in the criminal enterprise. The 30-page Statement of

Facts admits and describes Volkswagen's and IAV's, another independent engineering firm, roles in the emissions fraud and is attached as **Exhibit D** and incorporated herein.

186.     The foregoing facts provide an additional plausible basis supporting the allegations of a conspiracy and the existence of a RICO enterprise.

187.     The persons and entities described in the preceding paragraphs 153 through 186 are members of and constitute an "association-in-fact" enterprise.

188.     The Emissions Fraud Enterprise began as early as 2005, when an internal feasibility study at VWAG identified Bosch's EDC17 as a solution to their engineering dilemma by reducing vehicle emissions of nitrogen oxides ("$NO_x$") through a change in engine electronics.  Starting in mid-2005, Volkswagen and Bosch GmbH entered into a series of agreements to develop what ultimately became the defeat device for the Affected Vehicles.  The Emissions Fraud Enterprise continued without interruption for approximately the next ten years, as the Volkswagen Defendants continued to install Bosch EDC17s in the Affected Vehicles that employed defeat devices and Bosch GmbH continued to work with Volkswagen to modify the EDC17 programming for new models while Bosch LLC continued to promote diesel technology and coordinate the ongoing deception of state and federal regulators.  The Emissions Fraud Enterprise was first publicly disclosed in approximately September of 2015 when Volkswagen finally admitted the fraudulent scheme to U.S. regulators who exposed the RICO Defendants to the public.  The Emissions Fraud Enterprise ceased shortly after the September 18, 2015, and November 2, 2015, NOVs, when the Volkswagen Defendants issued stop sale orders to all existing franchised dealers to cease selling or leasing the Affected Vehicles.

189.     At all relevant times, the Emissions Fraud Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of

racketeering in which the RICO Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including the Volkswagen Defendants, the Bosch Defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Affected Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities. Each member of the Emissions Fraud Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and existing and prospective franchise dealers alike nationwide.[3]

190.     The Emissions Fraud Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for the RICO Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Affected Vehicles.

191.     The Emissions Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Affected Vehicles throughout the country, and the receipt of monies from the sale of the same. The significant sales of these Affected

---

[3] Volkswagen sold more Affected Vehicles by utilizing an emissions control system that was cheaper than SCRs, all the while charging consumers a premium for purportedly "clean," "environmentally friendly," and "fuel efficient" vehicles.

Vehicles also enticed DAM to expend substantial funds in an effort open a new VW-brand dealership in Ohio.

192.     Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis.  The Emissions Fraud Enterprise used this common communication network for the purpose of manufacturing, marketing, testing and selling the Affected Vehicles to the general public nationwide.

193.     Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the Emissions Fraud Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenue and market share, and minimizing losses.

194.     The RICO Defendants participated in the operation and management of the Emissions Fraud Enterprise by directing its affairs, as described herein.   While the RICO Defendants participated in, and are members of, the Enterprise, they have a separate existence from the Enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

195.     The Volkswagen RICO Defendants exerted substantial control and participated in the affairs of the Emissions Fraud Enterprise by:

>    a. making the decision to transition to the design of their diesel vehicles away from an effective SCR emissions control system and adopt instead the ineffective LNT emissions system, controlled by the Bosch-supplied EDC Unit 17;
>
>    b. designing the Affected Vehicles with defeat devices;

c. continuing to employ defeat device programming in later SCR-based vehicles in order to offer more powerful and fuel efficient vehicles to increase sales and profit margins;

d. failing to correct or disable the defeat devices when warned;

e. manufacturing, distributing, and selling the Affected Vehicles that emitted greater pollution than allowable under applicable regulations;

f. misrepresenting or omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

g. introducing the Affected Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

h. concealing the existence of the defeat devices and the unlawfully high emissions from regulators, existing and prospective franchised dealers, and the public;

i. persisting in the manufacturing, distribution, and sale of the Affected Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

j. misleading government regulators as to the nature of the defeat devices and the defects in the Affected Vehicles;

k. misleading the driving public as to the nature of the defeat devices and the defects in the Affected Vehicles;

l. designing and distributing marketing materials that misrepresented and concealed the defect in the Affected Vehicles;

m. otherwise misrepresenting or concealing the defective nature of the Affected Vehicles from the public, regulators, and existing and prospective franchise dealers;

n.  illegally selling and/or distributing the Affected Vehicles; collecting revenues and profits from the sale of such products; and ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

196.   The Bosch Defendants also participated in, operated and/or directed the Emissions Fraud Enterprise.   Bosch GmbH participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC17 which operated as a "defeat device" in the Affected Vehicles.   Bosch GmbH exercised tight control over the coding and other aspects of the defeat device software and was closely collaborated with Volkswagen to develop, customize, and calibrate the defeat devices.   Additionally, Bosch GmbH and Bosch LLC continuously cooperated with the Volkswagen Defendants to ensure that the EDC17 was fully integrated into the Affected Vehicles.   Bosch LLC and Bosch GmbH also participated in the affairs of the Enterprise by concealing the defeat devices on U.S. documentation and in communications with U.S. regulators.   Finally, Bosch LLC actively lobbied lawmakers in the U.S. on Volkswagen's behalf.   Bosch GmbH collected tens of millions of dollars in revenues and profits from the hidden defeat devices in the Affected Vehicles.

197.   Without the RICO Defendants' willing participation, including Bosch GmbH's active involvement in developing and supplying the critical defeat devices for the Affected Vehicles and Bosch LLC's active promotion of diesel technology and concealment of the defrauding of regulators, the Emissions Fraud Enterprise's scheme and common course of conduct would not have been successful.

198.   The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which DAM cannot fully know at present, because such information lies in the Defendants' and others' hands.

199.     The members of the Emissions Fraud Enterprise all served a common purpose; namely, to outsell their law-abiding competitors and increase their revenues through the sale of as many Affected Vehicles as possible.  Each member of the Emissions Fraud Enterprise shared the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.  The Volkswagen Defendants sold more Affected Vehicles by utilizing an emissions control system that was cheaper to install and allowed for generous performance and efficiency tuning, all the while charging consumers a premium for purportedly "clean," "environmentally friendly," and "fuel efficient" Affected Vehicles.  Bosch GmbH, in turn, sold more EDC Units because the Volkswagen Defendants manufactured and sold more Affected Vehicles.  The RICO Defendants achieved their common purpose by repeatedly misrepresenting and concealing the nature of the Affected Vehicles and the ability of the emissions control systems to effectively reduce toxic emissions during normal operating conditions.

200.     To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants conducted or participated in the conduct of the affairs of the Emissions Fraud Enterprise through a pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

201.     Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

202.     The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a. application for certificates submitted to the EPA and CARB and Approved Applications received in the mail on April 9, 2008, June 23, 2008, June 6, 2008, and July 2, 2000.

b. applications submitted to the EPA and CARB for each model year as follows:

    i. Model Year ("MY") 2009-2015 VW Jetta;

    ii. MY 2009-2014 VW Jetta Sportwagen;

    iii. MY 2010-2015 VW Golf;

    iv. MY 205 VW Golf Sportwagen;

    v. MY 2013-2015 VW Beetle and VW Beetle Convertible; and

    vi. MY 2012-2015 VW Passat.

c. the Affected Vehicles themselves;

d. component parts for the defeat devices;

e. falsified emissions tests;

f. fraudulently-obtained EPA COCs and CARB EOs;

g. vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

h. documents and communications that facilitated the falsified emissions tests;

i. false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

j. sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Affected Vehicles;

k.  documents intended to facilitate the manufacture and sale of the Affected Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

l.  documents to process and receive payment for the Affected Vehicles by unsuspecting franchise dealers, including invoices and receipts;

m.  payments to Bosch GmbH;

n.  deposits of proceeds;

o.  and other documents and things, including electronic communications.

203.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Affected Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| Bosch LLC | VW America | December 2009 | Documents and communications related to Volkswagen "Clean Diesel" Partnership, 2009 Review and 2010 Opportunities, Bosch Diesel Systems North America Marketing. |
| Bosch LLC | CARB | September 2009 | Documents and communications related to Diesel Tech Day in El Monte, CA. |
| VW America Manufacturing Plant | South Bay VW | October 2011 | Shipment of Volkswagen Jetta TDI Affected Vehicles. |
| Washington State Department of Licensing | Dan Clements | October 2011 | Mailed registration card for 2012 Volkswagen Touareg TDI based on false emission test due to concealed defeat device. |
| CARB | VW America | July 2014 | Mailed EO for 2015 Affected Vehicles based on fraudulent application. |

| California Department of Motor Vehicles | Phillip Clark | December 2014 | Mailed registration card for 2014 Volkswagen Touareg TDI based on false emissions test due to concealed defeat device. |
| California Department of Motor Vehicles | Caroline Hoag | December 2014 | Mailed renewed registration for 2011 Jetta SportWagen TDI based on false emission test due to concealed defeat device. |
| Washington State Department of Licensing | Dan Clements | February 2015 | Mailed registration certificate for 2012 Volkwasgen Touareg TDI based on false emission test due to concealed defeat device. |

204.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
| --- | --- | --- | --- |
| Pignataro Volkswagen, Washington | American Express, North Carolina | April 2012 | Credit card transaction in the amount of $5,000 for down payment on 2012 VW Touareg by Dan Clements. |
| CARB, California | VW America, Virginia | May 2014 | Email communications concerning the WVU study. |
| VW America, Michigan | EPA, Michigan; CARB, California | May 2012 | Misleading application(s) for COC and EO for 2013 Passat TDI. |
| Bosch America, Farmington Hills, Michigan | Volkswagen, Virginia | January 2013 | Email communications regarding Bosch's promotion of VW Passat TDI through trip from Atlanta to Washington D.C. |
| VW America, Virginia | CARB, California | October 2014 | Misleading communications about discrepancies identified in the WVU study. |

| Audi of Lynnbrook, New York | American Express, North Carolina | December 2014 | Credit card transaction in the amount of $2,586.45 for down payment on lease of 2015 Audi A3 by Kevin and Elizabeth Bedard. |
|---|---|---|---|
| VW America, Virginia | EPA, District of Columbia | December 2014 | Misleading communications about software patch for the Affected Vehicles without revealing fact of the defeat device. |
| Bosch LLC, Michigan | CARB, California | January 2015 | Email communications re: meeting with CARB. |
| VW America, Michigan | Audi AG, Germany | February 2015 | Email communication concerning meeting with Bosch and CARB re: fault codes. |

205.    The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

206.    The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.  Specifically, VW Group, under the direction and control of Volkswagen AG and its executives, made misrepresentations about the Affected Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

207.    The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

208.    The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure

consumers into purchasing the Affected Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that Affected Vehicles were "clean" diesel cars.

209. Many of the precise dates of the fraudulent use of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, DAM has described the types of, and in some instances, occasions on the predicate acts of mail and/or wire fraud occurred. They include thousands of communications and perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

210. The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

211. The RICO Defendants aided and abetted others in violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

212. To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emission dangers of the Affected Vehicles and obfuscated the true nature of the warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Affected Vehicles.

213.     The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Affected Vehicles (and the defeat devices contained therein).

214.     Indeed, for the conspiracy to succeed each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics – specifically complete secrecy about the defeat devices in the Affected Vehicles.

215.     The RICO Defendants knew and intended that government regulators as well as DAM would rely on the material misrepresentations and omissions made by them and VW Group about the Affected Vehicles.  The RICO Defendants knew and intended that existing and proposed franchise dealers, including DAM, would incur costs and damages as a result.  As fully alleged herein, DAM, along with other existing and prospective franchise dealers, relied upon Defendants' representations and omissions that were made or caused by them.  DAM's reliance is made obvious by the fact that: (1) it invested hundreds of thousands of dollars in the Westerville LOI and the concomitant VW-brand dealership, whose worth has now plummeted since the scheme was revealed; and (2) its invested substantial time and effort in attempt to fulfill the Westerville LOI, in part to be able to sell and service the Affected Vehicles, but which are now no longer in operation.  In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by the RICO Defendants; otherwise, Volkswagen could not have obtained valid COCs and EOs to sell the Affected Vehicles.

216.     The RICO Defendants conduct in furtherance of this scheme was intentional.  DAM was harmed as a result of the RICO Defendants' intentional conduct.  DAM, regulators and

consumers, among others, relied on the RICO Defendants' material misrepresentations and omissions.

217.     As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for many years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding DAM and other franchise dealers and obtaining significant monies, revenues, and capital investments from them and through them while not providing the VW-brand and popular products, like the Affected Vehicles, on which DAM relied in deciding to pursue the Westerville LOI.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

218.     The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of DAM, other franchise dealers and consumers.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Emissions Fraud Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining DAM's capital investments for an artificially inflated VW-brand and potential profit as well as dealership goodwill values, and avoiding the expenses associated with remediating the Affected Vehicles.

219.     During the design, manufacture, testing, marketing and sale of the Affected Vehicles, the RICO Defendants shared technical, marketing and financial information that plainly revealed the emissions control systems in the Affected Vehicles as the ineffective, illegal and fraudulent pieces of technology they were and are.  Nevertheless, the RICO Defendants shared and disseminated information that deliberately represented Affected Vehicles as "clean," "environmentally friendly," and "fuel efficient."

220.     By reason of and as a result of the conduct of the RICO Defendants, and in particular, its pattern of racketeering activity, DAM has been injured in its business and/or property in multiple ways, including but not limited:

     a.  Overpayment or excessive investment in the Westerville LOI;

     b.  Loss of monies expended in reliance on and in fulfillment of the Westerville LOI;

     c.  Loss of value of the prospective VW franchise; and

     d.  Loss of expected profits.

221.     The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to DAM, and DAM is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).  Each of the RICO Defendants knew, understood and intended for DAM to rely upon its potential sales and service revenue from the Affected Vehicles, and knew, understood and foresaw that revelation of the truth would injure DAM and result in those expectations not being fulfilled.

WHEREFORE DAM seeks:

    (a)  Compensatory damages as proven at trial

    (b)  Treble and punitive damages as allowed under law and as proven at trial;

    (c)  Attorneys' fees and related litigation expenses, including prejudgment interest and costs;

    (d)  any other relief that this Court deems just and appropriate.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated:  December 21, 2017   Respectfully submitted,

          DIRECT AUTOMOTIVE MANAGEMENT, INC.
          By Counsel


          WALSH, COLUCCI, LUBELEY,
          & WALSH, P.C.

          /s/ E. Andrew Burcher
          E. Andrew Burcher, VSB #41310
          Matthew A, Westover, VSB #82798
          Attorneys for Plaintiff
          4310 Prince William Parkway, Suite 300
          Prince William, VA 22192
          Phone: (703) 680-4664
          Fax:  (703) 680-2161
          eaburcher@thelandlawyers.com
          mwestover@thelandlawyers.com

        Of Counsel:

        Richard N. Sox, FL Bar No. 982156 (Pro Hac Pending)
        W. Kirby Bissell, FL Bar No. 0100166 (Pro Hac Pending)
        Attorneys for Plaintiff
        BASS SOX MERCER
        2822 Remington Green Circle
        Tallahassee, Florida 32308
        Phone: 850-878-6404
        Fax: 850-942-4869
        rsox@dealerlawyer.com
        kbissell@dealerlawyer.com